IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2018

## KEVIN CLARK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Overton County**
**No. 2010-CR-6      David A. Patterson, Judge**

_____

**No. M2017-00755-CCA-R3-PC**

_____

An Overton County jury convicted the Petitioner, Kevin Clark, of two counts of first degree premeditated murder, two counts of aggravated assault, one count of reckless endangerment, one count of aggravated arson, and one count of abuse of a corpse. The trial court sentenced him to an effective sentence of two consecutive life sentences. This court affirmed the trial court's judgments on appeal. *State v. Kevin Clark*, No. M2912-01744-CCA-R3-CD, 2013 WL 6145812 (Tenn. Crim. App., at Nashville, Nov. 21, 2013), *perm. app. denied* (Tenn. Apr. 8, 2014). The Petitioner filed a petition for post-conviction relief in which he alleged, as relevant on appeal, that the post-conviction court erred when it denied his petition for post-conviction relief because: (1) he was deprived of his right to an impartial jury because of an improper communication between a juror and a witness; and (2) he received the ineffective assistance of counsel at trial. He further contended that the post-conviction court erred when it: (1) did not limit the scope of cross-examination of the Petitioner's witness to questions relevant to the post-conviction petition; and (2) did not consider all the issues presented in his petition for post-conviction relief. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Josh Hoeppner, Kingsport, Tennessee, for the appellant, Kevin Clark.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Bryant C. Dunaway, District Attorney General; and, Mark Edward Gore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

## A. Trial

This case arises from the killing of the Petitioner's mother and brother on May 13, 2009, deaths for which he was indicted and convicted. In our opinion affirming the Petitioner's convictions, we summarized the facts presented at trial as follows:

The [Petitioner's] convictions relate to events that transpired on May 13, 2009. At trial, the [Petitioner's] ex-wife, Susan Beth Clark, testified that in May 2009, she and the [Petitioner] lived in a house on property that adjoined property owned by the [Petitioner's] mother, Vida Clark, one of the homicide victims in this case. She recalled that when she returned home from work at approximately 5:30 p.m. on May 12, 2009, "[t]here was a fence across the driveway that had yellow bags on it." She said that no secondary driveway provided access to her home and that the driveway blocked by the fence was the only way to her house. In consequence, the sight of the fence made her "physically ill," and she was forced to "drive up a field" to get to her house, nearly damaging her car. Susan Clark said that she did not immediately wake the [Petitioner], who was sleeping because he worked third shift, but instead set about cleaning the kitchen. At one point, she went "to the back field" to scrape out scrap food and overheard Vida Clark, Roy Clark, the other homicide victim, and Sharon Miller "whispering and snickering and laughing." Susan Clark testified that she believed that the trio wanted her to wake the [Petitioner] and tell him about the fence, so she did not do it. She said that, instead, she woke him up at 9:00 p.m. as she usually did. At that point, she told him about the fence, and the [Petitioner] responded, "'You're kidding.'" He then telephoned Jerry Clark, and after he finished his conversation, he said, "'I can't worry about it. I've got to go to work.'" Susan Clark maintained that the [Petitioner] was not mad or upset but that he "just seemed real puzzled."

According to Susan Clark, when the [Petitioner] returned from work in the morning, he told her that he needed to mow a neighbor's yard before the rain and that he could not "'deal with this today.'" She said that she told him that they could discuss the matter of the fence with her brother, an attorney, when she finished her shift at work. The [Petitioner] agreed, and she left for work. Susan Clark testified that the [Petitioner] telephoned her at 6:35 a.m., and he was "not in his right self." The [Petitioner] said to her, "'It's been took care of. I've called the fire department and the police department.'" He then said, "'They're not going to take me alive.'" Terrified, Susan Clark telephoned Jerry Clark, "and he said he didn't want to go up there." She then telephoned the [Petitioner's] friend and pastor,

2

Kevin Phillips, and asked him to investigate.

During cross-examination, Susan Clark testified that the [Petitioner] made no threats toward Roy and Vida Clark. She said that Roy Clark, the [Petitioner's] younger brother, lived with Vida Clark. She said she had not seen the [Petitioner] fight with Roy Clark, but she had seen Roy Clark "stare [the Petitioner] down" and had seen Roy Clark tell Vida Clark "that [the Petitioner] was staring at him, when in fact [the Petitioner] wasn't staring at him."

The [Petitioner's] older brother, Jerry Clark, testified that the [Petitioner] had lived next door to their mother for "eight or ten years" on property that Jerry Clark had sold to the [Petitioner]. Their younger brother, Roy Clark, lived with their mother. On May 12, 2009, the [Petitioner] telephoned Jerry Clark and told him that Vida and Roy Clark had placed a fence across his driveway. He said that he suggested that the [Petitioner] complete a driveway that he had started to build on another part of the property to avoid trouble. The [Petitioner] said that he should be permitted to use the existing driveway and indicated an intent to hire a lawyer to investigate the issue. After Jerry Clark said, "Well, do whatever you need to do," the [Petitioner] responded, "'I believe I'm just going to take care of this myself.'" Jerry Clark said that he encouraged the [Petitioner] a second time to use the other driveway, and the [Petitioner] again said he would "take care of it."

Jerry Clark testified that, on the following morning, Susan Clark telephoned him, and, in response to her call, he went to his mother's house. When he arrived, "[i]t was in flames." He said that he also saw his mother lying in the driveway. Jerry Clark said that no one else was around, so he "[k]indly got [him]self out of sight" until emergency personnel arrived.

During cross-examination, Jerry Clark acknowledged that the driveway he had suggested the [Petitioner] use was not finished. In the rain, that driveway would not have been passable. He acknowledged that, as executor of his mother's estate, he had sued the [Petitioner] for $1 million.

The video-recorded deposition of State witness William Brockette and an accompanying transcript were tendered as exhibits over the [Petitioner's] objection. In the deposition, Mr. Brockette testified that he had worked with the [Petitioner] on the third shift sanitation crew at the

3

Perdue Farms chicken processing plant in Monterrey. On May 12, 2009, the [Petitioner] told Mr. Brockette about an altercation with the [Petitioner's] brother "about a fence [that] had been put up across the driveway." The [Petitioner] told Mr. Brockette that "if that fence was still up when he got off work that morning and went home, that he was going to kill him." Mr. Brockette said that he did not take the threat seriously, believing the [Petitioner] was "just blowing off some steam." He said that the [Petitioner] was "very frustrated" about the fence. Mr. Brockette said that he told the [Petitioner] to telephone an attorney to deal with the situation and provided him with the name of an attorney. The [Petitioner] told Mr. Brockette that "it just burns him up . . . how his brother acts." According to Mr. Brockette, the [Petitioner] said that his mother had "always taken up for Roy, and Roy . . . can't do anything wrong, and she's always got excuses for things that he does." Mr. Brockette said that "[i]t seems like there was a . . . lot of frustration from past years, you know, that had boiled up to . . . what happened." Eventually, the men began to work, and the [Petitioner] did not mention the fence again. Mr. Brockette remembered that the [Petitioner] left before 5:00 a.m. on the following morning, explaining that the [Petitioner] had intended to buy a weed-eater from Mr. Brockette but forgot the weed-eater in Mr. Brockette's truck. Mr. Brockette said that when he saw that the weed-eater was still in his truck, he tried to call the [Petitioner], but the [Petitioner] did not answer.

On May 13, 2009, the [Petitioner's] mother, Vida Clark, telephoned 9-1-1 and reported that her son had come to her residence at 141 Hassler Road in Overton County and had shot "both" of them. She told the 9-1-1 operator her arm "is about blowed off" and then made no other sound. The operator dispatched police to the scene.

Near that same time, neighbors Jewel Belle Melton and Paul Walker saw smoke coming from the residence at 141 Hassler Road. Ms. Melton testified that she was on her front porch when she saw 141 Hassler Road "go shebang." She said that she thought the house "probably caught on fire, blowed up or something." Ms. Melton recalled that shortly before the house burned, the [Petitioner] telephoned her and asked if she knew "that fence was up down there." She said that she told him that she did and said that Vida Clark had told her about the fence. She testified that the [Petitioner] said, "God bless you," and hung up the phone. Mr. Walker testified that he was awakened by gunshots at approximately 6:30 or 7:00 a.m. He said it sounded as though the shots had come from Vida Clark's residence. He said he telephoned a neighbor, who said that he had not

4

heard any shots. Mr. Walker said that he later heard more shots. He then went to make coffee, and when he returned to the window, he saw smoke coming from Vida Clark's residence.

Overton County Sheriff's Department Sergeant Robert Garrett and Deputy Derrick Ledbetter responded to Vida Clark's 9-1-1 call. Parking several hundred yards away from the residence due to the nature of the call, the officers used tree cover as they made their approach to the house because they had been advised that the shooter was still on the scene. Sergeant Garrett testified that as they approached the house, he encountered some individuals who told him there was a body near the house. Sergeant Garrett observed the body lying three or four feet from the house, and after clearing the area, he and Deputy Ledbetter dragged the body away from the flames. He said that the house was fully engulfed in flames.

After setting up a perimeter and waiting for other officers, Sergeant Garrett and those officers made their approach toward the [Petitioner's] house. As they approached, they saw the [Petitioner] standing in the doorway of his back porch with a camouflage colored rifle in his hand. The [Petitioner], who appeared to be wearing a field jacket, ordered the officers to fall back. They initially fell back but then took another path toward the [Petitioner's] house. Sergeant Garrett recalled that as he began to cross a fence, he heard "what sounded like two .22 shots." Deputy Ledbetter "came across and was turning to cover for" Deputy John Mackey when Sergeant Garrett heard a "louder boom, that came from a larger caliber." At that point, Deputy Ledbetter "grabbed his shoulder and hit the ground and said, 'I've been hit.'" Sergeant Garrett removed Deputy Ledbetter's shirt and examined his chest underneath the ballistics vest and observed "a large amount of redness on his shoulder area."

Sergeant Garrett testified that after a period of negotiating with his pastor, the [Petitioner] surrendered and "was apprehended peacefully." When officers entered the [Petitioner's] house, they observed "a small kitchen-like table, and it had two guns on it pointing out the window." Officers observed a camouflage jacket on the floor.

Deputies Mackey and Ledbetter confirmed Sergeant Garrett's recitation of the day's events. Deputy Ledbetter added that Vida Clark's body was quite hot and that when he "grabbed her, it was just warm and like, you know, just real jelly feel."

5

Agent Greg Whittaker of the State of Tennessee Bomb and Arson Unit testified that he was called to investigate the fire at 141 Hassler Road. He said that after a brief period of consultation with the other officers on the scene and fellow agent Craig Frost, the larger scene was divided into three crime scenes: 141 Hassler Road, 135 Hassler Road, and the female victim's body. Agent Whittaker began his investigation by walking around the fire "trying to develop fire patterns, and looking at the damage to the residence to determine where the fire could have possibly originated." As he circled the residence, he saw "numerous shotgun shells located on the outside of the residence." After this preliminary examination, he began to process the scene "from the area of less damage to the area of the greatest damage." The right side of the residence bore the most damage. As he conducted his investigation, he created a video of the scene that was played for the jury.

Agent Whittaker said that he found the bodies of a human and a dog in the kitchen area of the burned home. The body had suffered severe fire damage. Agent Whittaker determined that the fire originated on the right side of the house. He said that "an unusual burn pattern on the exterior of the residence" was consistent with the use of an accelerant to start the fire.

At the [Petitioner's] residence, officers recovered "gasoline found in some quart jars, along with some foam-type products commonly associated with maybe some type of incendiary device itself." Based upon his investigation, Agent Whittaker concluded that the fire was "an incendiary fire. It is a set fire." He said that "[t]here was no way" that the fire could have started at its point of origin "other than being set." No other possible sources of the fire existed.

Tennessee Bureau of Investigation ("TBI") Agent Steve Huntly responded to a call from the Overton County Sheriff to investigate the crimes on Hassler Road. Agent Huntley said that he headed the investigation and took a primarily administrative role. Agent Huntley recovered the Ruger 10/22 and Winchester pump-action 12-gauge shotgun from the [Petitioner's] residence. He also collected the [Petitioner's] jacket for testing and found "shot shells" and one slug in the pocket. Agent Huntley took possession of those items collected by other agents during the investigation at 141 Hassler Road. After officers finished processing the three scenes, Agent Huntley went to the medical examiners [sic] office, where he collected shotgun pellets recovered from Vida Clark's arm and from Roy Clark's abdomen. He also collected the [Petitioner's] clothing

6

and boots from the jail. Agent Huntley took all of the collected evidence to the TBI laboratory for testing.

TBI Agent Billy Miller testified that he was called to assist Agent Huntley in the investigation. At the Hassler Road scene, Agent Miller manned a table where evidence was processed as it was collected. After arson investigators finished examining the inside of the 141 Hassler Road residence, he completed the exterior processing of that scene. During that processing, Agent Miller discovered "a casing from a 12-gauge spent round" on the right side of the crime scene, another on the left side, and other partially-intact 12-gauge shell casings on the ground. He also found the "skin" to a metal door that bore a "gash to the right of the doorknob." There were also holes in the doorknob itself as well as holes in a dent in the door. Forensic examination established that the shells had been fired from the shotgun recovered from the [Petitioner's] residence.

TBI Agent and Firearms Identification Expert Steve Scott testified that he examined a 12-gauge shotgun and a .22-caliber rifle taken from the [Petitioner's] residence as well as a number of "shotshell" cases and .22-caliber cartridge cases. He said that the birdshot pellets obtained from the victims at autopsy were "consistent, or within the size and weight specifications of" those shotshells he determined had been fired by the 12-gauge shotgun. He also examined a window screen and determined that a hole in the screen was caused by a shotgun blast with the muzzle of the gun aimed less than five feet away from the screen.

TBI Special Agent and Forensic Scientist Randall Curt Nelson testified that he analyzed three vials of liquid obtained from the [Petitioner's] residence and determined them to be "gasoline-range products." Forensic analysis of the [Petitioner's] jacket, boots, and clothing "revealed the presence of an evaporated gasoline range product." Testing also revealed the presence of an evaporated gasoline-range product on a piece of pipe foam taken from the [Petitioner's] residence. During cross-examination, Agent Nelson admitted that he could not quantify the amount of the substance that was on any of the items.

TBI Special Agent and Forensic Scientist Robert T. Miles, III, testified that he examined the [Petitioner's] jacket, boots, and clothing for the presence of gunshot residue. He found the residue on all three items.

Doctor Thomas Deering, the forensic pathologist who performed the

7

autopsies of Vida and Roy Clark, testified that Roy Clark's body had "been burned to a point that portions of the body had started to disintegrate because of the burning." In fact, the feet had been burned off the body completely and part of the skull had burned away, exposing Roy Clark's brain. In addition, "the body had also been injured by a shotgun wound." Based upon the location of the wound and the pellets inside Roy Clark's body, Doctor Deering determined that Roy Clark was shot in the back left flank. Pellets from the shotgun blast lacerated Roy Clark's spleen, left kidney, liver, diaphragm, pancreas, and "the mesentery of the intestines, which is where the vessels run to support all of the intestines." Doctor Deering said that the absence of soot from Roy Clark's airways established that he did not breathe the smoke from the fire. Additionally, the level of carbon monoxide in his blood was akin to that of a heavy smoker but not at a level consistent with his being alive during the fire. Doctor Deering determined that the cause of Roy Clark's death was a shotgun wound to the abdomen.

Doctor Deering testified that Vida Clark suffered "at least two, and maybe stray pellets from more than two" shotgun wounds. In addition, she had "thermal injuries" to her head, torso, legs, and right forearm. A shotgun wound to the back of the left side of her neck injured her vertebrae and spinal cord, and "some of the pellets exited, and they came out her mouth, knocking out the teeth, lacerating the lips and the face around the mouth." The second entrance wound was on the back of the left arm, and it followed a downward trajectory. Doctor Deering said that Vida Clark also had a number of "separated pellet holes, kind of scattered across the back." He said that these wounds could have come from the blast to her arm or from another blast altogether. Doctor Deering characterized the wound to Vida Clark's neck as lethal. He said that it would have been impossible for Vida Clark to call 9-1-1 after suffering that wound because it nearly severed her spinal cord and did sever the left vertebral artery as well as fracture her jaw, break her teeth, and seriously injure her lips and tongue. He said that she would have fallen immediately after being shot and would not have been able to move. Vida Clark's blood contained an elevated level of carbon monoxide, indicating that she lived long enough to breathe the smoke from her burning home.

*Clark*, 2013 WL 6145812, at *1-6.

Based upon this evidence, the jury convicted the Petitioner of the first degree premeditated murder of his brother, Roy Clark, and of his mother, Vida Clark. It also

8

convicted him of the felony murder of Vida Clark and the aggravated assault of Deputy John Mackey and Sergeant Robert Garrett. Finally, it convicted him of reckless endangerment of Deputy Derrick Ledbetter. The trial court merged the felony murder conviction of Vida Clark in to the premeditated murder conviction. The trial court sentenced the Petitioner to life sentences for each of the two remaining murder convictions, and it ordered that those sentences be served consecutively. The trial court then ordered that the sentences for the remaining convictions be served concurrently with the life sentences.

## B. Post-Conviction Facts

The Petitioner filed a petition for post-conviction relief in which he alleged that he had received the ineffective assistance of counsel. He also made other allegations, including that he was deprived of his right to an impartial jury because of an improper communication between a juror and a witness. At a hearing on the petition, the parties presented the following evidence: T.B.[1] testified that he was a juror during the Petitioner's criminal trial, and, at that time, he was twenty or twenty-one years of age. T.B. recalled that, during voir dire, the State's attorney asked the venire if they were aware of someone by the name of William Timothy Brockette. At the post-conviction hearing, T.B. said that he knew Mr. Brockette through motorcross, and that the two had met at a track in Silver Point, Tennessee, but he did not state as much in response to the State's attorney's inquiry.

T.B. said that Mr. Brockette testified via video at the trial. T.B. said it was possible that he contacted Mr. Brockette during the trial but that he had no memory of doing so.

During cross-examination, T.B. testified that he was simply acquainted with Mr. Brockette. Further, he knew him as "Tim Brockette" not "William Timothy Brockette," so he did not realize during voir dire that he was acquainted with him. T.B. said that he and Mr. Brockette had never had dinner together, had never gone to each others' houses, and were not related to each other. T.B. stated that the two had never discussed this case. T.B. said that, if he had talked to Mr. Brockette since the trial, it would have been days or months after the trial, and he was sure the two did not communicate during the trial.

During redirect examination, T.B. said that while he did not immediately recognize Mr. Brockette's name, once he saw him on the video he recognized him. He assumed it was too late to mention that he was acquainted with Mr. Brockette.

---

1 To protect the privacy of the juror, we will refer to him by his initials only.

Mr. Brockette testified that he was a witness in the Petitioner's criminal trial but that he testified by video and was not present in court. Mr. Brockette testified that he knew T.B. from riding dirt bikes in Silver Point. He said that he saw him in the summertime only on Saturdays or Sundays. T.B. assisted Mr. Brockette's son in learning to ride motorcross.

Mr. Brockette said that during the trial T.B. contacted him and said, "I saw you on video today." Mr. Brockette said that he believed that his video was shown the first day, so he assumed that the trial had not concluded when T.B. contacted him.

During cross-examination, Mr. Brockette said that the substance of his trial testimony was that he had heard the Petitioner say that if the gate wasn't moved he was going to kill someone. Mr. Brockette said that he did not believe at the time that the Petitioner intended to kill anyone. Mr. Brockette said that it was possible that he spoke with T.B. after the trial. He said that it was not unusual for the two to talk via telephone to arrange to meet to go riding. Mr. Brockette also characterized his relationship with T.B. as "acquaintances."

Paul Walker testified that he lived near the scene of these killings, and he gave a statement to law enforcement regarding what he had seen. Mr. Walker said that he told law enforcement that there had been a long-running feud between the Petitioner and his brother, Roy Clark. He also told them, that on the day of these events, he heard what sounded like the Petitioner and Mr. Clark yelling at one another, but he could not be sure it was them because he did not recognize their voices.

After having his recollection refreshed, Mr. Walker testified that he had told law enforcement that the Petitioner told him that he had not spoken with Mr. Clark for the last year. He further told law enforcement that, during the altercation, it sounded like Mr. Clark told the Petitioner to "come over here."

Mr. Walker said that, during the trial, the State's attorney asked him if there was friction between the two brothers, and he responded, "No." He explained that he was not asked about the yelling that he had heard.

During cross-examination, Mr. Walker said that after he testified he left the trial. Mr. Walker said that he responded "No" to the friction question because, until the day of the shooting, he had not heard any arguments between the two men. He only heard them argue the morning of the shooting, so he felt he answered the question posed honestly.

Susan Clark testified that she was married to the Petitioner at the time of these events. She said that, during the trial, she was not asked about any changes to the

Petitioner's work schedule or medication before these killings. She said that, had she been asked, she would have testified that his work schedule had changed to third shift and that he was taking medication for "panic anxiety" and "depression anxiety." Ms. Clark said that she thought that the Petitioner was taking his medication as prescribed but then he started having changes in his personality, such as forgetfulness. She then learned that he had not been taking his medication as prescribed. She took him to the doctor, who switched his medicine to the "opposite of what he was taking . . . before," and it "really messed with him."

Ms. Clark said she could have testified to these facts during the trial and that she had discussed these facts with the Petitioner's attorney.

During cross-examination, Ms. Clark testified that the Petitioner's attorney had an investigator come and take pictures of the house. She agreed that there was a photograph of the fence at issue that was introduced to the jury. Ms. Clark said she recalled an incident prior to this when the Petitioner shot repeatedly at her car. She explained that the Petitioner was using the car for target practice because it was going to be sold for scrap.

During redirect examination, Ms. Clark testified that the Petitioner's shooting of the car was not a violent incident.

Counsel testified that he was an assistant public defender and was not originally appointed to represent the Petitioner but that he took the case over after the preliminary hearing and represented the Petitioner during this trial and on appeal. He said that, at the time of trial, he had been a practicing attorney for thirteen years and that he had represented other clients facing homicide charges. Counsel recalled that this was his initial first degree murder trial as lead counsel but that he had acted as second chair in other criminal trials.

Counsel recounted how he prepared for upcoming trials, including his investigation methods. Counsel said that he received discovery in this case and, as he did so, he would meet with the Petitioner to review it. Another very experienced lawyer from his office offered to sit second chair at this trial. Counsel said he filed close to twenty-four motions.

Counsel said that after reviewing all of the evidence, he felt that the State's case was "[s]trong." His investigation revealed no other possible defendant who could have committed the killings or shot at the police officers who responded to the scene. Therefore, Counsel developed a trial strategy based upon attacking the mens rea for the intent at the time of the shootings. He said that there was not a lot of evidence that the

11

Petitioner planned the shooting. Counsel sought to convince the jury that the Petitioner was guilty of a lesser-included offense. Counsel stated that the strategy was somewhat successful in that the Petitioner was convicted of a lesser-included offense with regard to Officer Ledbetter.

Counsel testified that the investigation did not reveal any helpful witnesses. The Petitioner requested that several witnesses be subpoenaed. Counsel subpoenaed those witnesses but, after speaking with the four that appeared at trial, he determined that none of them would have provided any material assistance. Counsel said that the Petitioner had hoped these witnesses would testify that Roy Clark was aggressive or violent, but Counsel found the contrary to be true.

Counsel testified that he recalled using peremptory challenges to strike some jurors, but he did not know how many or which jurors he struck. Counsel did not specifically recall one of the potential jurors saying that he or she was related to the victims. He said, however, that had this happened he would have discussed with the Petitioner the issues and told him that Counsel would strike anyone that the Petitioner wanted stricken. He further stated that, if a potential juror had disclosed a relationship with a police officer, he and the Petitioner would have discussed that.

Counsel said that he did admit to the jury that the Petitioner had shot his brother, his mother, and the officer. He said that it was his belief that there was overwhelming proof of this. He hoped to gain the jury's trust in order to successfully argue that the Petitioner did not act with premeditation. Counsel reiterated that, after a thorough investigation, there was no proof that the Petitioner was not guilty of committing the killings.

Counsel testified that he requested and received funding to have the Petitioner mentally evaluated by Dr. Seidner. Counsel said that he provided Dr. Seidner with the Petitioner's medications, medical history, educational history, and mental history. The testing results would not have helped the Petitioner at trial. Dr. Seidner's findings were "pretty blunt and definitive," so Counsel did not seek a second evaluation.

Counsel said that he recalled Ms. Clark testifying about the Petitioner's change in behavior and her statements that he was not acting normally. He did not recall her specifically mentioning anything about the Petitioner's medications. She may have mentioned his changing work schedule, but Counsel did not recall. Counsel said that he had no information at the time that the Petitioner could possibly pursue an involuntary intoxication defense, and he did not believe that Dr. Seidner had this information either.

Counsel testified that he investigated whether there was a possible self-defense

12

argument. He said that the investigation revealed some information that would have been helpful to the Petitioner, but he thought it would not be admissible. Counsel recalled looking into the Petitioner's allegations that Mr. Clark had substance abuse issues, and he found some evidence supporting this claim. He decided that whether Mr. Clark used or sold drugs was not evidence that would have been admissible under the rules of evidence.

Counsel said that he advised the Petitioner not to testify and that the Petitioner agreed with this advice. He said that they and the second chair counsel discussed this decision at length.

During cross-examination, Counsel testified that he vaguely recalled Juror Ballard and Mr. Brockette. He said that there were two alternate jurors that sat on the case. Counsel said that Mr. Brockette testified by video tape and that he cross-examined him during the recording. Counsel's goal was to attempt to minimize the incriminating statements that the Petitioner made to Mr. Brockette.

Counsel explained that he did not cross-examine Mr. Brockette about the Defendant's character because he would have opened the door to the admission of evidence regarding the Defendant's poor character. He said that the shooting of the car itself was not an issue because the car was being used for target practice, but it was the relation of the car to the crime scene that would have been damaging. Further, one of the witnesses that the Petitioner requested be subpoenaed told Counsel that Mr. Clark was not the violent brother but that the Petitioner was the violent one. The witness additionally told Counsel that the Petitioner had harassed him and his family and had even exposed himself to them on one occasion. In fact, every witness that the Petitioner asked to be subpoenaed said that they were not going to help the Petitioner and that they could only hurt the case.

Counsel said he did not ask the witness Paul Walker about whether there had been a long-standing feud between Mr. Clark and the Petitioner because he did not think that doing so would be a good trial strategy. Counsel said that evidence of a long-standing feud would have hurt his strategy to argue that the Petitioner did not have the requisite mens rea for first degree murder. Counsel further noted that he did not want to focus on the fence, in part because it seemed to be a petty thing to trigger such a catastrophic event.

Counsel testified that the attorney who sat second chair and helped him with the trial had more than twenty years of experience and had experience with criminal homicide trials. Further, Counsel said that he himself had extensive experience and that he had achieved some successes in his career. He said that he also preserved issues that he thought might be appealable to this court. One such issue was the "Brockette

13

deposition" issue. Counsel said that he objected to the admission of this deposition both in writing and before the trial court and that he also made it part of his motion for a new trial. Counsel said that he then appealed the issue and filed a writ of certiorari in the Tennessee Supreme Court, which was denied.

Counsel reiterated that he filed approximately twenty-four motions, some of which were successful. Counsel said that he met with the Petitioner "a lot" both at court appearances and at the jail. During their meetings, the Petitioner asked questions, the two discussed types of defense theories, and the Petitioner appeared to understand their trial strategy. Counsel gave the Petitioner a copy of anything that he received related to the trial. Counsel felt the Petitioner was able to engage in the active defense of his case.

Counsel testified that he went to the crime scene in this case and that he examined the physical evidence. After speaking with the investigator he was sure that the Petitioner's only viable defense was negating the mens rea. He reiterated that, given the evidence, it was going to be difficult to be successful with this defense, but Counsel felt it was their only option. Counsel agreed that the evidence included that the Petitioner was calm after the homicides, that there were numerous gun shells around the victims' home, that gunshots could be heard in the background of the 911 call, and that the Petitioner expressed his intention to take care of the problem to both his wife and a co-worker before the homicides. There was also evidence that the Defendant was in possession of incendiary devices and his clothing tested positive for gasoline and gunshot residue. There was also some burn splatter that was consistent with a Molotov cocktail, and police found Molotov cocktails in the Petitioner's residence.

Counsel said that, after Dr. Seidner evaluated the Petitioner, he gave Counsel his opinion. Counsel said that, in essence, Dr. Seidner said that "sometimes people get pissed off and kill other people" and that such was the case with the Petitioner. Counsel asked Dr. Seidner not to put his opinion in writing, and then he relayed this information to the Petitioner.

Counsel said that he did not hire an independent fire expert based upon his own investigation and his conversations with the Petitioner. About voir dire, he said that the Petitioner participated fully and asked to strike several potential jurors.

Counsel said that the Petitioner never indicated to him that Mr. Clark was shooting at him during these events.

Michael Hartung testified that he was formerly married to the Petitioner's sister, and he knew both the Petitioner and Mr. Clark. Mr. Clark assisted him in building their home. Mr. Hartung testified that he and Mr. Clark had a good relationship. However,

14

Mr. Clark called him at work several times threatening him. Mr. Clark told Mr. Hartung that he had better treat Mr. Clark's sister right and then threatened to "whoop [his] ass" if he did not. Mr. Hartung said he told his wife about this and said that Mr. Clark seemed to be doing this after drinking. Mr. Hartung recalled that Mr. Clark would get "real intoxicated and sometimes he would, you know, be on pills and stuff . . . ." This behavior escalated to a point where Mr. Hartung became "really concerned." Mr. Hartung said that he did not testify at the Petitioner's trial and that, if he had been called, his testimony would have been consistent with this post-conviction testimony.

During cross-examination, Mr. Hartung testified that he met the Petitioner two or three times. The Petitioner came to his house and tried to get Mr. Hartung and his wife to go to church. Mr. Hartung agreed he was not present at the time the shooting occurred.

Derek Sidwell testified that he was not present at the crime scene and he had no involvement in this case. He agreed that he was related to J.S., who was a juror, but said that the two never discussed any aspect of this case.

Based upon this evidence, the post-conviction court found:

When a Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below the range of competence demanded of attorneys in criminal cases. Second, he must show that the deficiencies actually had an adverse effect on the defense.

This he has not done.

The overall standard for evaluating a claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

This Post-Conviction Court can find no reason to question the result of this case, as determined by the jury's verdicts.

Wherefore, it is hereby Ordered that the Petition for Relief from Conviction is Denied.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

15

On appeal, the Petitioner contends: (1) he was deprived of his right to an impartial jury because of an improper communication between a juror and a witness; and (2) he received the ineffective assistance of counsel at trial. He further contends that the post-conviction court erred when it: (1) did not limit the scope of cross-examination of the Petitioner's witness to questions relevant to the post-conviction petition; and (2) did not consider all the issues presented in his petition for post-conviction relief.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

## A. Witness and Juror Communication

The Petitioner contends that juror Travis Ballard had improper communication with a witness who testified via video recording, Timothy Brockette. Mr. Brockette testified that Juror Ballard called him and said, "I saw you on video today" and said little more. Juror Ballard testified that he did not recognize Mr. Brockette's name as given during voire dire because he knew him by another name and that he did not think that he spoke with Mr. Brockette until after the trial. The Petitioner contends that this communication violated his right to an impartial jury. The State counters that the Petitioner failed to show that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence. We agree with the State.

Under both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, every criminal defendant has the right to a trial by an impartial jury. *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012)). "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own

experience and knowledge." *Id*. (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). If the jury has been exposed to extraneous prejudicial information or subjected to an improper outside influence, the validity of the verdict is questionable and a new trial may be warranted. *Id*. (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)).

"A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id*. at 651 (citing *Caldararo*, 794 S.W.2d at 740-41). Once such a showing has been made, "a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Id*. (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). Whether the constitutional right to an impartial jury has been violated is a mixed question of law and fact which we review de novo, granting a presumption of correctness only to the trial court's findings of fact. *Id*. at 656 (citing *Fields*, 40 S.W.3d at 458).

"[A] defendant is entitled to a fair trial, not a perfect trial, and our ultimate inquiry is whether the jury that tried the case was actually fair and impartial." *State v. Leath*, 461 S.W.3d 73, 110-11 (Tenn. Crim. App. 2013) (internal quotation omitted). "It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Thus, it would be unreasonable, and perhaps unwise, to expect juries to be completely sterilized and free of any external influences." *Caldararo*, 794 S.W.2d at 743-44 (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Thus, our courts have generally defined extraneous prejudicial information as information "coming from without," or more specifically as "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Adams*, 405 S.W.3d at 650 (citations omitted). Similarly, an improper outside influence has been defined as "any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Id*. at 650-51 (internal quotation omitted). These categories "often overlap" and may be considered together. Neil P. Cohen, et al., TENNESSEE LAW OF EVIDENCE § 6.06[6], at 6–54 (5th ed. 2005) (citing *Blackwell*, 664 S.W.2d at 688-89). However, Tennessee courts have drawn a "distinction between extrinsic and intrinsic influence" on the jury. *Caldararo*, 794 S.W.2d at 742. "External influences that could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial, (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case." *Id*. (citations omitted). On the other hand, internal influences such as "(1) discussions among jurors, (2) intimidation or harassment of one juror by another, (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions" are not reason enough for a new trial. *Id*.

(citations omitted).

As an initial matter, the Petitioner has failed to produce any admissible or credible evidence to make the initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence. *See Adams*, 405 S.W.3d at 651. Juror Ballard's testimony was that he did not communicate with Mr. Brockette until after the trial. Mr. Brockette said that Juror Ballard must have contacted him during the trial because he opened their conversation with, "I saw you on a video today." By Mr. Brockette's testimony, the two did not discuss the case further or go into the facts surrounding the events underlying the case. This communication was neither unauthorized private communication with a juror nor did it bear directly on a fact at issue in the case. *See Adams*, 405 S.W.3d at 650. The Petitioner did not establish an improper outside influence that would raise a presumption of prejudice; thus, the burden never shifted to the State to rebut such a presumption. *Adams*, 405 S.W.3d at 651. The Petitioner is not entitled to relief.

## B.  Ineffective Assistance of Counsel

The Petitioner next contends that Counsel was ineffective for failing to appeal whether the cumulative effect of the errors at trial rendered the Petitioner's trial fundamentally unfair. In his argument, the Petitioner again brings up, as he did on direct appeal, that Mr. Brockette's video deposition should not have been admitted, that the admission of forensic testing, and that the evidence was insufficient to sustain his conviction. He concedes that Counsel appealed these issues and that this court found them without merit, but he argues that Counsel should have also argued that the cumulative effect of these "errors" entitled the Petitioner to relief. The State counters that Counsel is not constitutionally required to raise every conceivable issue on appeal and that decisions as to which issues to raise are generally within Counsel's discretion, citing *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that

18

counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. 690.

We conclude that Counsel was not ineffective in his appeal of the Petitioner's case. Counsel preserved and presented several issues, and it was within his discretion to determine which issues to appeal. When Counsel appealed his convictions, this court held that the State had failed to establish that "exceptional circumstances" warranted the taking of Mr. Brockette's deposition but that, although Mr. Brockette's testimony was "quite damaging," it was not the only proof of premeditation and that the proof of premeditation was "overwhelming." *Clark*, 2013 WL 6145812, at \*7. About the forensic testing, this court concluded that the evidence sufficiently established the chain of custody of the Petitioner's clothing. *Id.* at \*11. The court further concluded that the evidence sufficiently supported his convictions. As the court found that there was only one error, we further conclude that the Petitioner cannot show that he was prejudiced by Counsel's failure to appeal whether the cumulative effect of the errors entitled the Petitioner to relief. The Petitioner is not entitled to relief on this issue.

### C. Post-Conviction Court's Rulings

The Petitioner further contends that the post-conviction court erred when it: (1) did not limit the scope of cross-examination of the Petitioner's witness to questions relevant to the post-conviction petition; and (2) did not consider all the issues presented in his petition for post-conviction relief.

### 1. Scope of Cross-Examination

The Petitioner first contends that the post-conviction court erred when it did not limit the State's cross-examination of his former wife, Ms. Clark, because the ruling contradicted Tennessee Supreme Court Rule 28, section 8(D)(4) states that "the hearing shall be limited to issues raised in the petition." The two instances to which the Petitioner points were, first, when the State asked Ms. Clark about her trial testimony about the fence that was erected between her property and the victims' property. The second instance involved when the State asked about whether the Petitioner had been violent in the past, including an incident during which he shot at her old vehicle.

The State counters that these questions were relevant to the Petitioner's contentions that Counsel was ineffective for failing to offer proof of his poor mental health and resulting unusual behavior before the crimes to support a diminished capacity defense. Ms. Clark was the only witness who testified about the Petitioner's mental health. She also testified about the events leading to the killings, so the State properly

20

questioned her about the discrepancies between her trial and post-conviction testimonies. We agree with the State.

We apply the foregoing principle of statutory construction to determine whether Tennessee Rule of Evidence 611(b) is the generally applicable rule controlling the scope of cross-examination and it allows unlimited cross-examination of all witnesses and permitting questions "on any matter relevant to any issue in the case, including credibility . . . ." Tenn. R. Evid. 611(b). In contrast, Tennessee Supreme Court Rule 28, section 8(C)(1)(d) is a specific rule that limits the scope of cross-examination in the following particular context and manner: "Under no circumstances shall petitioner be required to testify regarding the facts of the conviction which the petition attacks unless necessary to establish the allegations of the petition or necessary to the state's attempt to rebut the allegations of the petition." *Id*. Thus, with respect to the testimony of a post-conviction petitioner, the specific limitation provided in Rule 28, section 8(C)(1)(d) controls the scope of cross-examination and modifies the general rule provided in Rule 611(b) with respect to the Petitioner.

Tennessee Supreme Court Rule 28 does not provide for limiting the scope of cross-examination of other witnesses, but does, as the Petitioner notes, state that the hearing itself "shall be limited to issues raised in the petition." *Id.* at 8(D)(4). Initially, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this court will not interfere in the absence of abuse appearing on the face of the record. *Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008) (determining whether the post-conviction court erred when it refused to consider testimony it ruled was inadmissible hearsay). "It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *Pylant*, 263 S.W.3d at 870 (citing *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

We first note that the Petitioner's remedy to improper cross-examination would be a new post-conviction hearing. *See Keough v. State*, 356 S.W.3d 366, 372 (Tenn. 2011). We conclude, however, that the Petitioner is not entitled to a new hearing. The post-conviction court did not abuse its discretion when it allowed the State to cross-examine his former wife about the Petitioner's response to the erection of the fence and also about his prior act of alleged violence. The Petitioner, in his petition, placed his mental health, and mental stability at the time of the killings at issue. The post-conviction court did not err when it determined that the State's line of questioning was within the scope of issues raised in the petition. The Petitioner is not entitled to relief on this issue.

21

## 2. Consideration Of All Issues Raised in Petition

The Petitioner finally contends that the post-conviction court erred when it did not address every issue he raised in his petition and only considered the issues about which the Petitioner had offered proof. The State counters that the post-conviction court adequately addressed each of the Petitioner's issues.

The Petitioner does not state which issues the post-conviction court failed to review or why such issue would be meritorious. He makes no citation to the record supporting his contention, other than the bare assertion that by its ruling "the post-conviction court deemed all such allegations and issues set forth by three prior filed petitions to be waived." This is not sufficient to support his argument. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . will be treated as waived in this court"). The Petitioner is not entitled to relief on this issue.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE